SOL GOTHARD, Judge.
Plaintiff, Ernest N. Souhlas, Jr., is appealing a March 15, 2004 judgment confirming the jury verdict rendered on March 11, 2004 and an April 20, 2004 judgment denying plaintiffs motions for a new trial and judgment notwithstanding the verdict.
This case arises out of a November 24, 2000 motor vehicle accident. On July 30, 2001 Ernest N. Souhlas, Jr. (hereinafter plaintiff) filed a petition for damages against Linda Thanh Le Tam, Nboc T. Do, and then’ insurer American National General Insurance Company. Also named as a defendant is plaintiffs underinsured motorist carrier USAA Casualty Insurance Company. Plaintiff alleged that he was slowing to a stop when a vehicle driven by Linda Thanh Le Tam and owned by Nboc T. Do, rammed the rear of plaintiffs vehicle causing plaintiff to sustain severe and disabling injuries, including cervical herniated discs. Plaintiff subsequently settled his claims with Linda Thanh Le Tam, Nboc T. Do, and American National General Insurance Company and they were dismissed from the suit, with prejudice, on November 6, 2001, leaving USAA Casualty Insurance Company (hereinafter defendant) as the sole remaining defendant in the case. On |3August 18, 2003 the court granted plaintiffs motion for summary judgment on the issue of liability, declaring Linda Tam Thanh Le one hundred per cent (100%) at fault in causing the automobile collision. The subsequent jury trial was bifurcated, with the trial on damages held first and the trial on plaintiffs claims for penalties and attorney fees held after the rendering of the judgment on the damages portion of the trial. The jury rendered a verdict on February 11, 2004 and made the following damage awards to plaintiff:
Past Medicals $12,347.06
Future Medicals $ 0
Future Loss of Earning Capacity $ 0
Disability (20% of anatomical & function) $ 0
Loss of Enjoyment of Life $ 0
Mental Anguish $ 0
Pain and Suffering $25,000.00
Total $37,347.06
In its March 15, 2004 judgment, the court adopted this award and dismissed plaintiffs claims for statutory penalties and attorney fees at plaintiffs cost. An April 20, 2004 judgment denied plaintiffs “Motion for Judgment Notwithstanding the Jury Verdict of February 11, 2004 or In the Alternative Motion for New Trial.” Plaintiff appealed.
There are no liability issues presented for our review. Therefore our review will be restricted to the award of damages to plaintiff.
At trial, the jury was presented with the following evidence and testimony regarding the injuries that plaintiff sustained as a result of the motor vehicle accident.
Plaintiff testified that he first sought medical treatment for the November 24, 2000 accident on Monday, November 27, 2000 at East Jefferson General Hospital.[1] In the hospital emergency department he complained about his neck, back, and a tingling numbness in his left hand. They x-rayed him, treated him with|4medication, and directed him to see his primary care physician if the condition persisted. The Emergency Department Report indicates that the x-ray films of his cervical spine, lumbar spine and left hand were normal.
Dr. Pedro N. Romaguera, a specialist in internal medicine, testified plaintiff visited *764 his office on December 18, 2000 complaining of back and neck pain after being involved in a car accident. Dr. Romagu-era’s medical records indicate that plaintiff described the pain as 8 out of 10. The physical exam was remarkable for spasms at the cervical and lumbar spine and the range of motion at the cervical and lumbar spine was decreased with pain. Dr. Roma-guera prescribed various medications for the pain and spasms. Plaintiff visited Dr. Romaguera four more times, and though medication did give plaintiff some relief, his neck pain persisted. Plaintiffs last visit with Dr. Romaguera was on October 17, 2002 for treatment of anxiety. Plaintiff was still complaining of severe neck pain. Dr. Romaguera further testified plaintiffs medical problems were probably caused by the November 24, 2000 accident.
Plaintiff testified that Dr. Romaguera advised him that it would take time for plaintiffs body to heal and that in the meantime all Dr. Romaguera could do was give him medication to make him more comfortable. He did not restrict plaintiffs work but told plaintiff not to overwork himself. However, plaintiffs employer allowed him to go on light duty and Dr. Romaguera agreed. Plaintiff continued to see Dr. Romaguera and the medication relieved his symptoms for brief periods.
Dr. Romaguera referred plaintiff to an orthopedic surgeon, Dr. Jeffrey Sketchier, in May 2001. Dr. Sketchier testified at trial that he treated plaintiff from May 3, 2001 until November 20, 2002. It is clear from Dr. Sketchler’s medical report that the visit was prompted by the November 24, 2000 automobile accident. An examination on the initial visit showed hypoac-tive reflexes in the biceps bilaterally. Plaintiff had near full range of motion of the cervical spine, with the |fiexception of rotation, but rotation reproduced some of his symptoms. Cervical spine compression also reproduced symptoms into the scapula and left upper extremity. A subsequent MRI of the cervical spine showed a disc herniation of C5-6 that lateralized toward the right side and a disc herniation at C6-7 that lateralized mainly toward the left side. Dr. Sketchier prescribed conservative treatment and physical therapy, which plaintiff followed from May 2001 through June 6, 2001. Following physical therapy, plaintiffs condition improved but did not completely resolve itself. He was subsequently instructed on home exercises and a home traction unit was prescribed. During the following period plaintiffs condition essentially remained unchanged and required additional medication on numerous occasions. At the last visit, on November 20, 2002, plaintiff was still having pain and his overall condition had not improved.
Dr. Sketchier opined that plaintiff has reached maximum medical improvement. He estimated plaintiffs permanent partial disability rating to be at 20% total body. Dr. Sketchier estimated the disability as both a functional and anatomical impairment. Assuming that plaintiffs condition did not worsen, Dr. Sketchier doubted that plaintiff would need surgery.
Dr. Sketchier referred plaintiff to Dr. John D. Jackson, an expert in the field of neurosurgery, for a neurological medical evaluation. Dr. Jackson testified that plaintiff visited his office on October 14, 2002. He determined that plaintiff had ruptured discs at C5-6 and C6-7, with the main pathology at C6-7 but could not tell when the ruptures occurred. There was no compression of the spinal cord and plaintiff had good nerve root involvement. Dr. Jackson did not recommend surgery during this visit because he thought that plaintiff had a chance of resolving the problem without surgery. He told plaintiff that he would recommend surgery if plaintiffs pain became unbearable or if the *765 discs began to irritate and compress the nerves and paralysis was a risk. Dr. Jackson agreed with Dr. Sketchler’s | (¡assessment that plaintiff has a twenty percent permanent partial disability, both functional and anatomical. Dr. Jackson opined that cervical surgery would take care of the pain problem but would limit motion in plaintiffs neck. Surgery would not change plaintiffs twenty percent permanent partial disability.
Dr. T. Luke Yang testified as an expert in the field of anesthesiology and pain management. Plaintiff visited Dr. Yang on November 22, 2002 for treatment of neck and shoulder pain and radiating pain into his left arm and hand. Dr. Yang treated plaintiff from November 22, 2002 through February 7, 2004. Dr. Yang did not recommend surgery for plaintiff because he believes that it would not eliminate the pain. He opined that plaintiff would need pain management for the rest of his life.
Plaintiff testified that his doctors could not guarantee that surgery would eliminate the pain, so he decided against surgery. He further testified that the pain is present day and night and can be severe at times, with inclement weather making it more intense. He has used medication, alternative methods such as acupuncture with Dr. T. Luke Yang, and traction to relieve it. Medication gives him temporary relief, but puts him in a “fog like state of mind.” Dr. Yang’s treatments avoid this side effect, eliminate the tingling in his left hand and have greatly improved his quality of life. They include a Libroderm patch which “masks” the pain for twelve hours and allows plaintiff to function normally and avoid pain medication. Plaintiff testified that he is currently seeing only one doctor, Dr. Yang.
Plaintiff uses a traction system three times a week at home which gives him total relief. He was using the system daily but developed headaches and jaw pain. After Dr. Jackson advised him that ninety percent of people who use traction on a daily basis have to have jaw surgery, plaintiff reduced the number of days in traction.
17Plaintiff was involved in several accidents prior to the accident at issue here. Plaintiff had previously mechanically hype-rextended his left wrist and had the problem corrected through surgery. Due to this injury, plaintiff was given a fifty pound lifting restriction on his left wrist. However, plaintiff testified that he was able to and did lift more than fifty pounds prior to the November 24, 2000 accident.
Before 1998 plaintiff was involved in what he described as a minor automobile accident where someone “tapped” his vehicle from the rear while he was stopped at a stop sign, resulting in a few weeks or months of heat compresses and treatment by his physician.
In a subsequent accident in 1998, plaintiffs car hydroplaned and slid under an eighteen wheeler. As a result, plaintiff was treated for upper back and neck pain by a chiropractor. Plaintiff testified that his insurance company directed him to a chiropractor for specific manipulations of Cl and C2, and right sacroiliac articulation. Plaintiff stated that the injury was resolved after treatment and he was able to return to regular work duties.
Plaintiff testified that he has worked for a company which installs central air conditioning and heating systems since approximately 1996. He started out as a helper and worked his way up to mechanic with a guaranteed forty hour work week. Prior to the accident, his job duties included moderate to heavy lifting, awkward situations, small spaces, and abnormal working conditions. After the accident his employ *766 er put him on light duty. As a mechanic, he has had a helper to assist him, both before and after the accident.
According to plaintiff, there are many job responsibilities that he can no longer perform due to restrictions on heavy lifting. He does not pick up anything heavier than thirty pounds and can no longer set units in attics or carry compressors or big gas furnaces. He worked forty hours a week for the first few [Sweeks after the accident due to a lot of filing and paperwork, then his hours declined. Plaintiff testified that since the accident he has received a pay raise but that his employer has informed him that he will not be entitled to future raises due to his lack of ability to perform.
In conclusion, plaintiff testified that none of the accidents prior to the one at issue herein resulted in restricting him from fully performing his work duties. However, plaintiff stated that the November 24, 2000 accident did restrict his ability to work as he did prior to the accident.
Todd Harris testified as an expert in the field of physical therapy. From April 10-11, 2002 Mr. Harris performed a functional capacity evaluation on plaintiff. He found that plaintiff was able to perform work that was classified as light work. Plaintiffs job is classified as a medium level job, which means being able to lift fifty pounds occasionally and twenty-five pounds on a frequent basis. Plaintiff can lift a maximum weight of twenty-eight pounds on an occasional basis. Mr. Harris opined that plaintiff is only able to perform his present job by working with a helper and by pacing himself.
Mr. Harris performed a neurological exam of plaintiffs neck and upper extremities. There were no paresthesias and no regional loss of sensation in the left hand. There were some range of motion limitations in rotation.
Plaintiff also offered the testimony of Nathaniel E. Fentress, an expert in vocational rehabilitation. Mr. Fentress performed a vocational rehabilitation evaluation on plaintiff and placed him in the middle range on most tests. Mr. Fentress testified that plaintiff has many skills that would be transferable to other career fields. According to Mr. Fentress, plaintiff would only need short term retraining.
Mr. Shael Wolfson, a forsenic economist, also testified at trial as an expert witness. In making his analysis, Mr. Wolfson was asked to assume that plaintiff |9had left his current profession. Mr. Wolfson calculated that, assuming plaintiff could not return to work at $25,660.00 dollars a year (plaintiffs 2002 W-2 indicated earnings) the total future economic loss would be $405,464.00. Assuming plaintiff could return to a different field of work as of the date of trial, and earn $14,196.00 a year, the loss would be $181,155.00. The $14,196.00 figure is the annualized equivalent of the average between minimum wage and $8.50 an hour. These calculations did not include any fringe benefits he may receive from an employer.
Defendant presented testimony from Dr. Robert Mímeles, an expert in orthopedic surgery, who performed an independent medical examination of plaintiff on July 22, 2002. According to Dr. Mímeles, plaintiffs only complaint with regard to the November 24, 2002 accident, was a neck injury. Dr. Mímeles’ examination revealed that plaintiff had good hyperextension, with mild pain. Plaintiff had a little bit of guarding with turning his head and neck to the left and hyperextending, but turned to the right quite well. There were no focal motor deficits with reflex testing or strength testing of the upper extremities. There was mild pain to palpation along the *767 inner border of the right scapula and over the scapular.
Dr. Mímeles also reviewed plaintiffs May 2001 MRI and found that plaintiff has a mild bulge on the sagittate at C5-6 and, to a slightly greater extent, at C6-7, with neither bulge compressing the cord. The bulges go into the subarachnoid space. On the axials the bulge is slightly more impressive at C5-6 towards the right neural foramen, but is not catching the nerve root, and plaintiff has no right-sided symp-tomalogy. On the axials, there is a definite bulge to the left at C6-7 which thins the spinal fluid into the subarachnoid space but does not compress the cord. It does not extend into the neural foramen. He later reviewed 1 inplaintiffs October 2002 MRI and found that it essentially mirrored plaintiffs May 2001 MRI, with no “dramatic” differences between the two.
Dr. Mímeles advised plaintiff to continue with conservative treatment unless the pain warrants otherwise. He also advised plaintiff to repeat the MRI of the cervical spine if plaintiff decides to have any type of invasive procedure, such as an epidural or surgery, in future. Dr. Mímeles also suggested that plaintiff try to reduce the amount of Lortab he is taking as this is a very addictive drug.
Dr. Mímeles also reviewed plaintiffs medical history and concluded that the November 24, 2000 accident primarily exacerbated plaintiffs neck pain from a previous accident. He did not think that plaintiff was a candidate for surgery. The only lesion in question, according to Dr. Mímeles, is C6-7 since it is the only one that lateralizes slightly to the left side. From plaintiffs history of complaining of exacerbation of neck and left arm pain, Dr. Mímeles assumed that the November 24, 2002 accident could have exacerbated this disc.
As previously stated, plaintiffs assignments of error relate to damages awarded by the jury. Specifically, plaintiff argues that the award of $25,000.00 damages for pain and suffering, and the failure to award damages for loss of future earning capacity, loss of enjoyment of life and future medicate, are an abuse of the discretion of the trier of fact.
As this Court noted in Angelle v. Delery, 02-0644 (La.App. 5 Cir. 11/26/02), 833 So.2d 469, 475:
Vast discretion is accorded the trier of fact in fixing general damage awards. La. Civ.Code art. 2324.1. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.
|nThe Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994) explained:
It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Our review of the record leads us to conclude that the trial court was not manifestly erroneous in its award of $25,000 in general damages. Because we cannot find an abuse of discretion it is inappropriate for us to consider damage awards in other cases.
*768 The same analysis applies to the trial 'court’s failure to award damages for loss of future earning capacity and loss of enjoyment of life. A reasonable trier of fact could have found under the circumstances of this case that there was not sufficient evidence presented to support awards for loss of future earning capacity and loss of enjoyment of life.
However, we do find merit in plaintiffs argument that the failure to award any damages for future medicals is error. While we do not agree with plaintiffs argument in brief that plaintiff should' be awarded future medicals for the cost of surgery, we do find that testimony established that plaintiff would require future medicals for pain management. We therefore amend the judgment to award plaintiff $5,000.00 in future medicals.
For the foregoing reasons, we amend the trial court’s judgment in this case to award additional damages as set forth herein, and as amended we affirm.

AMENDED AND. AFFIRMED AS AMENDED.

. A copy of the Emergency Department Report is included in the record. Musculoskele-tal neck and back pain is listed as the clinical impression.